IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BENJAMIN T. HOUSTON,

                      Plaintiff,                             CV-06-1123-ST

       v.                                    FINDINGS AND
                                                  RECOMMENDATIONS

COUNTY OF WASHINGTON; MARK T.
FOWLER; MICHELLE E. HOUSTON; ADAM
SPANG, individually; ROBERT  B. WOLFE,
individually, JUAN ELENES, individually;
DAVIDSON GREAVES, individually,

Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

On May 5, 2006, defendant Robert Wolfe ("Officer Wolfe"), a Beaverton police officer, arrested plaintiff, Benjamin Houston ("Mr. Houston"), for allegedly violating a restraining order which prohibited him from having certain types of contact with his ex-wife, defendant Michelle E. Houston ("Ms. Houston").  The circumstances surrounding his arrest and treatment while incarcerated prior to posting bail, form the basis of this lawsuit.  Mr. Houston filed his Second

1 - FINDINGS AND RECOMMENDATIONS

Amended Complaint ("SAC") on October 30, 2006, bringing claims against three separate groups of defendants. His first claim alleges that, pursuant to 42 USC § 1983 ("§ 1983"), Officer Wolfe and Adam Spang ("Sergeant Spang") falsely arrested him in violation of his Fourth Amendment right to be free from unreasonable seizures. His second and third claims alleges that Ms. Houston and her friend, Mark Fowler ("Mr. Fowler"), are liable for false imprisonment and intentional infliction of emotional distress ("IIED"). His fourth and final claim alleges, pursuant to § 1983, alleges that Washington County, Juan Elenes ("Elenes") and Davidson Greaves ("Greaves") violated his Fourth Amendment right to be free from unreasonable searches.

All defendants have moved for summary judgment pursuant to FRCP 56. The motions by Ms. Houston and Mr. Fowler (dockets # 66 & # 83 respectively) join in the motions by Officer Wolfe and Sergeant Spang (docket # 60). Similarly, Elenes, Greaves and Washington County have filed a joint memorandum along with supporting documents in support of their respective motions (dockets # 54 & # 55).

This court has jurisdiction over the § 1983 claims pursuant to 28 USC § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367.

For the reasons set forth below, the motions of Officer Wolfe, Sergeant Spang, Ms. Houston and Mr. Fowler should be granted and the First, Second and Third Claims should be dismissed. However, the motions of Greaves, Elenes and Washington County should be denied.

## **STANDARDS**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317,

2 - FINDINGS AND RECOMMENDATIONS

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party."  *Id* (citation omitted).

In response to a motion for summary judgment, FRCP 56 (e) requires that:

> an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or
> as otherwise provided in this rule, must set forth specific facts showing
> that there is a genuine issue for trial.

However, "a party against whom a motion for summary judgment is directed need not

file any contravening affidavits or other material but is entitled to a denial of the motion for

summary judgment where the movant's papers are insufficient on their face or themselves

demonstrate the existence of a material issue of fact."  *Hamilton v. Keystone Tankship Corp.*,

539 F2d 684, 686 (9th Cir 1976).  Apart from the SAC and his response brief, Mr. Houston has

provided nothing to support his version of the facts surrounding his arrest which is very different

than the defendants' facts.  Thus, this court must accept the defendants' affidavits as

uncontradicted and grant summary judgment if the evidence submitted, taken in the light most

3 - FINDINGS AND RECOMMENDATIONS

favorable to Mr. Houston, would be sufficient to support a directed verdict at trial. *THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F2d 991, 993-94 (9th Cir 1980); *Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793 F2d 1100, 1103-04 (9th Cir 1986).

## UNDISPUTED FACTS

### I. Relationship Between Mr. Houston and Ms. Houston

Mr. Houston and Ms. Houston divorced in 1990 and are the biological parents of Zachary Houston ("Zachary"). Ms. Houston currently has custody of Zachary and the two live in Oregon. Mr. Houston lives in Tennessee and has visitation rights with Zachary which causes him to come to Oregon on occasion. On one of these visits, the events forming the basis of this lawsuit occurred.

Contact between Mr. Houston and Ms. Houston was restricted pursuant to a several judgments related to their divorce and a restraining order issued pursuant to Oregon's Family Abuse Prevention Act ("FAPA"), ORS 107.700-.732. First is a Judgment of Modification dated October 2, 2003, and issued by the Marion County Circuit Court in Oregon ("2003 Judgment"). Wolfe Decl., Exhibit 2. The 2003 Judgment grants sole custody of Zachary to Ms. Houston. *Id* at 2. It outlines Mr. Houston's parenting time, dictates when he can contact Zachary by telephone, and establishes unilateral and reciprocal restraining orders. Of particular relevance to this motion are the following provisions:

> **1. Custody and Parenting Time**. Respondent [Ms. Houston] shall have custody of Zachary Houston, subject to Petitioner's [Mr. Houston's] right of reasonable parenting time as set forth below, and this order shall supercede prior orders to the extent there is a conflict.

> \* \* \*

> **d. School**. Petitioner shall not go to Zachary's school except for scheduled school performances in which Zachary is a participant

or school conferences or school open houses.  Petitioner may not initiate school conferences outside of the annual/semi-annual scheduled parent/teacher conference.

* * *

**f.  Telephone Calls.**  Petitioner shall have two telephone calls each week with Zachary at 7:00 p.m. on Sunday and 7:00 p.m. on Wednesday.

* * *

**7.  Unilateral Restraining Orders.**  *Except for the fact that each party shall have the right communicate* [sic] *with the other by e-mail limited strictly to the topic of parenting time*, Petitioner shall be restrained and enjoined as follows:

a.  Petitioner shall have no contact with Respondent, and he shall make no attempt to contact Respondent (except regarding a present medical emergency involving Zachary) for any purpose whatsoever (except for e-mail communication regarding parenting time).  Petitioner shall not harass or abuse Respondent physically or verbally.

* * *

*Id* at 2-4 (emphasis in original).

On August 17, 2005, Washington County issued a Restraining Order to Prevent Abuse, restraining Mr. Houston from having contact with Ms. Houston ("2005 Restraining Order"). Wolfe Decl., Exhibit 1.  Mr. Houston contested the 2005 Restraining Order, but it was left in effect after a hearing held on September 9, 2005.  Wagner Aff., Exhibit 3.  The 2005 Restraining Order was issued pursuant to FAPA and prohibits Mr. Houston from "[c]ontacting or attempting to contact [Ms. Houston] in person," and "[c]ontacting or attempting to contact [Ms. Houston] by telephone *(except as allowed in the Parenting Time Order).*"  Wolfe Decl., Exhibit 1, p. 4 (emphasis in original).  It further restrains Mr. Houston, "from entering, attempting to enter and/or remaining in the following locations *(except as allowed in the Parenting Time Order)*: . . . D.  The area within 100 yards of [Ms. Houston]" and "G. The child's(ren's) school."  *Id* at 3-4

(emphasis in original).  Another provision provides that Mr. Houston may continue to have parenting time "as determined thru divorced [*sic*]."  *Id* at 6.

On November 2, 2005, the Marion Count Circuit Court entered a Stipulated Supplemental Judgment (Modification of Parenting Time) ("2005 Judgment").  Wolfe Decl., Exhibit 3.  The 2005 Judgment reduces the parenting time available to Mr. Houston and designates the Beaverton Police Department as the transfer location.  *Id* at 1-2.  Subparagraph "d." states:  "This parenting plan contained in this judgment *supercedes* the parenting plan contained in all prior Judgments in this case."  *Id* at 2 (emphasis added).  The 2005 Judgment also restricts telephone contact between Mr. Houston and Zachary to calls made to "Respondent's [Ms. Houston's] home phone number on Tuesday, Thursday, and Sunday each week at 7:00 p.m. PST."  *Id.*  It has no provision permitting Mr. Houston to go to Zachary's school.

Finally, on April 20, 2006, the Marion County Circuit Court issued a Supplemental Judgment Modifying Parenting Time and Remedial Contempt ("2006 Judgment").  Wolfe Decl., Exhibit 4.  The 2006 Judgment made changes to the parenting time allowed Mr. Houston under the 2005 Judgment and was entered after Ms. Houston failed to file a written response to Mr. Houston's motion.  *Id* at 1.  Of particular relevance to this case is paragraph "1d." which reads: "**Telephone**.  Father has the right to call, at reasonable times and hours, 5 days per week.  Saturday, Sunday, Tuesday, Thursday, and Friday."  *Id* at 4 (emphasis in original).

## II.    May 5, 2006 Arrest

On Friday, May 5, 2006, Mr. Houston arrived at the Beaverton Police Station to pick up Zachary for his scheduled parenting time.  Shortly after his arrival, Officer Wolfe arrested him for several alleged violations of the 2005 Restraining Order.  Wolfe Decl., ¶¶ 16-17, 19.  The

6 - FINDINGS AND RECOMMENDATIONS

arrest was not Officer Wolfe's first contact with Mr. Houston and Ms. Houston.

Officer Wolfe had first met Ms. Houston on April 21, 2006 when she complained that Mr. Houston had violated the 2005 Restraining Order by calling her that same day at a time and number not permitted by the 2005 Judgment. *Id* at ¶¶ 2-3. Officer Wolfe met with Ms. Houston who showed him the 2003 Judgment, 2005 Judgment, and 2005 Restraining Order. These documents supported Ms. Houston's allegation that Mr. Houston's telephone call to her cell-phone at 6:00 p.m. on a Friday violated the terms of the 2005 Judgment which did not permit Mr. Houston to contact her on that day, at that time, or at that number. *Id* at ¶¶ 4-5. Officer Wolfe contacted Mr. Houston who ultimately produced a copy of the 2006 Judgment which had changed the telephone contact permitted under the 2005 Judgment. *Id* at ¶¶ 6-7. Because the 2006 Judgment permitted the contact, Officer Wolfe discontinued the investigation. *Id* at ¶ 9.

Shortly thereafter, Officer Wolfe learned of several other alleged violations of the 2005 Restraining Order which occurred prior to the April 21, 2006 contact and prior to the issuance of the 2006 Judgment. First, Mr. Houston had allegedly gone to Zachary's school for a scheduled parent-teacher conference on March 20, 2006, which Officer Wolfe did not believe was permitted by the 2005 Judgment and therefore violated paragraph 2G of the 2005 Restraining Order. *Id* at ¶ 12. Second, while at the school, Mr. Houston went to Zachary's classroom where Ms. Houston was already meeting with the teacher, and, therefore, came within 100 yards of Ms. Houston in violation of paragraph 2D of the 2005 Restraining Order. *Id*.

Officer Wolfe claims he learned about both of these incidents from his conversation with Beaverton Police Officer Madalyn Brown who took Ms. Houston's complaint on March 20, 2006. *Id* at ¶ 10; Wolfe Decl., Exhibit 6, p. 3. The combination of that conversation, his review of Officer Brown's report, and his earlier knowledge of the contacts permitted under the 2005

Judgment and 2005 Restraining Order led him to determine that probable cause existed to arrest Mr. Houston for violating the 2005 Restraining Order.  *Id* at ¶¶ 11-12.

A few days later, on May 5, 2006, Officer Wolfe read an email from Ms. Houston to Officer Brown sent on May 3, 2006 on which he was copied.[1]  *Id* at ¶ 13.  Included was a chain of earlier emails between Ms. Houston and Officer Brown.  Wolfe Decl., Exhibit 7.  One of these emails spoke of an alleged telephone call on March 21, 2006 that violated the terms of the 2005 Judgment.  *Id* at 3.  Also significant, according to Officer Wolfe, was a statement by Officer Brown in one of the emails that the District Attorney intended to issue an arrest warrant for Mr. Houston for the March 20 contact at Zachary's school.  *Id* at 1; Wolfe Decl., ¶¶ 14-15.

That same day Mr. Houston came to the Beaverton Police station to pick up his son for scheduled parenting time.  Officer Wolfe met him and questioned him about the alleged violations of the 2005 Restraining Order which he had earlier verified was still valid.  *Id* at ¶¶ 5, 17.  Mr. Houston admitted that he had gone to Zachary's school but claimed it was permitted by the terms of the various divorce judgments.  *Id* at ¶¶ 17-18.  Mr. Houston produced a copy of the 2006 Judgment, which Officer Wolfe pointed out was not in effect the date of the school contact.  *Id.*  Mr. Houston claims he then offered to produce a copy of the 2003 Judgment permitting the contact, but Officer Wolfe refused to let him go to his car to get it.  Based upon the information he already had gathered, as well as Mr. Houston's admission, Officer Wolfe arrested Mr. Houston pursuant to ORS 133.310(3).  That statute requires a police officer to arrest a person without a warrant where he has probable cause to believe the person violated a restraining order issued

---

[1] These emails are attached as exhibits to Officer Wolfe's declaration.  Along with the copies of the police reports underlying the events of this case submitted by Officer Wolfe, they are inadmissible for their truth as they are unauthenticated and hearsay.  However they are admissible for the limited purpose of demonstrating the officer's state of mind, namely, the basis for his belief that probable cause existed.

8 - FINDINGS AND RECOMMENDATIONS

pursuant to the FAPA.  Officer Wolfe placed Mr. Houston into a holding cell at the Beaverton

Police Department.  Wolfe Decl., ¶ 17.

Upon his arrest, Mr. Houston requested to speak with Officer Wolfe's supervisor.  *Id* at

¶ 19.  Officer Wolfe contacted Sergeant Spang, briefed him on the details of the case, and

explained why he had probable cause to arrest Mr. Houston.  *Id*; Spang Decl., ¶ 2.  Sergeant

Spang met with Mr. Houston who gave the same information he had already provided to Officer

Wolfe.  Spang Decl., ¶ 3.  After speaking with Mr. Houston, Sergeant Spang agreed that Officer

Wolfe should proceed with his arrest.  Wolfe Decl., ¶ 20.

## III.    **Detention and Strip Search**

After completing the arrest, Officer Wolfe notified transport services that Mr. Houston

was in a holding cell at the Beaverton Police Department and required transport to the

Washington County Jail and completed the necessary paperwork.  *Id* at ¶ 31.  Mr. Houston was

transported to the Washington County Jail from the Beaverton Police Department.  Greaves Decl.,

¶ 5.  Greaves was on duty when Mr. Houston arrived and reviewed his file and probable cause

affidavit in order to process him into the jail.  *Id* at ¶ 6.  Greaves determined that Mr. Houston

should be strip searched in accordance with Washington County Jail Policy J-14-4 "based upon

the fact that he had been held at another detention facility."  *Id* at ¶ 9; Defendant Washington

County, Juan Elenes, and Davidson Greaves Memorandum in Support of Motions for Summary

Judgment ("Wash. County Memo"), Exhibit 3, p. 7.  Greaves was "aware" that Mr. Houston had

been arrested for violation of a restraining order, meaning that he could not be "force released or

released upon his own recognizance," and could only be released by a judge's order or upon

posting $5,000 (10% of the $50,000 security required for violations of restraining orders).

Greaves Decl., ¶¶ 19-22; Wash. County Memo, Exhibit 5, pp. 2, 5-6.  Greaves learned from

talking to Mr. Houston that he was from out of state and had no funds to post security when he

9 - FINDINGS AND RECOMMENDATIONS

was booked into the Washington County Jail.  Greaves Decl., ¶ 21.

Greaves directed Elenes to perform the strip-search.  *Id* at ¶ 10.  Although he has no independent memory of the strip search, based upon a review of his duty notebook Elenes admits conducting the strip-search.  Elenes Decl., ¶ 12.  According to Elenes, nothing in his duty notebook indicates "that anything unusual or out of the ordinary occurred during that shift."  *Id.* Some evidence indicates that Mr. Houston was strip searched at the same time as another inmate. Greaves Decl., ¶ 25.  After being strip searched, Mr. Houston was "dressed in" and lodged at the Washington County Jail until May 8, 2006, when he posted security.  *Id* at ¶ 26.

Both Greaves and Elenes have had extensive training and experience in conducting strip searches in accordance with Washington County jail policy.  Greaves Decl., ¶ 16-17; Elenes Decl., ¶ 3.  Both are trained to and regularly record significant incidents in their duty notebook. Greaves Decl., ¶ 17; Elenes Decl., ¶¶ 10-11.  Both state that a review of their duty notebooks indicates nothing unusual occurred during the booking, dress-in and strip search of Mr. Houston. Greaves Decl. ¶ 18; Elenes Decl., ¶ 12.

Greaves further testifies that all of his training has "reinforced that no inmate is to be touched during a strip search unless the inmate becomes violent and needs to be restrained." Elenes Decl., ¶ 4.  He is to call for back up if he sees anything out of the ordinary or if an inmate becomes violent or disruptive.  *Id* at ¶ 5.

## FINDINGS

### I.    Claim Against Officer Wolfe and Sergeant Spang (First Claim)

Mr. Houston's first claim asserts a violation of his Fourth Amendment right to be free from unreasonable seizures by Officer Wolfe and Sergeant Spang.  Mr. Houston alleges that Officer Wolfe arrested him, with the approval of his supervisor Sergeant Spang, without probable cause to believe he committed a crime, or, even if probable cause did exist, in bad faith.  Officer

Wolfe and Sergeant Spang respond that they did not violate the Fourth Amendment because they had probable cause. Alternatively, they claim qualified immunity from suit.

A.    **Legal Standards**

The Fourth Amendment protects persons from "unreasonable searches and seizures." The "reasonableness" of a warrantless arrest "is determined by the existence of probable cause." *Barry v. Fowler*, 902 F2d 770, 772 (9th Cir 1990). Therefore, in order for a police officer to make a warrantless arrest in accordance with the Fourth Amendment, they must have probable cause. *U.S. v. Jensen*, 425 F3d 698, 704 (9th Cir 2005), *cert denied*, 547 US 1056 (2006).

An arrest without probable cause gives rise to a cause of action for damages under § 1983. *McKenzie v. Lamb*, 738 F2d 1005, 1007 (9th Cir 1984). Thus, Mr. Houston has a claim under § 1983 for violation of the Fourth Amendment only if he was arrested without probable cause. On the other hand, if police had probable cause to arrest him, then his false arrest claim "necessarily fails." *Hart v. Parks*, 450 F3d 1059, 1069 (9th Cir 2006), *citing Cabrera v. City of Huntington Park*, 159 F3d 374, 380 (9th Cir 1998) (*per curiam*).

 Probable cause exists where "'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.'" *Blankenhorn v. City of Orange*, 485 F3d 463, 471 (9th Cir 2007), *quoting Jensen*, 425 F3d at 704. Oregon uses a similar standard. ORS 131.005(11) ("'Probable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it").

When assessing probable cause, the court must look to "the totality of the circumstances known to the arresting officer, [to determine if] a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime." *John v. City of El Monte*, ___ F3d

11 - FINDINGS AND RECOMMENDATIONS

___, ___, 2007 WL 2781904, *3 (9th Cir Sept. 26, 2007), *quoting US v. Smith*, 790 F2d 789, 792 (9th Cir 1986).  "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes."  *Id*, *citing US v. Lopez*, 482 F3d 1067, 1072 (9th Cir 2007).  The court makes this determination "based upon the information the officer had at the time of making the arrest."  *Id*, *citing Devenpeck v. Alford*, 543 US 146, 152 (2004).  This court may not make the determination of whether an officer had probable cause based upon "hindsight analysis."  *Id*.  However, where the information available to the arresting officer, objectively viewed, supports a finding of probable cause, the officer will not be liable for an arrest simply because probable cause may have dissipated had the officer conducted further investigation.  *Id* at *5.

Although the existence of probable cause is a highly fact dependent issue, "whether a reasonable officer could have believed probable cause . . . existed to justify . . . an arrest is 'an essentially legal question' that should be determined by the district court at the earliest possible point in the litigation."  *Peng v. Mei Chin Penghu*, 335 F3d 970, 979 (9th Cir 2003), *cert. denied*, 540 US 1218 (2004), *quoting Act Up!/Portland v. Bagley*, 988 F2d 868, 873 (9th Cir 1993).  "Thus, where the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for this court to decide whether probable cause existed at the time [Officer Wolfe] arrested [Mr. Houston]."  *Id* at 979-80.

///

Under Oregon law, a police officer's decision to make a warrantless arrest based on probable cause is generally left to the officer's discretion.  ORS 133.310(1) ("A peace officer *may* arrest a person without a warrant if . . .") (emphasis added).  In a number of circumstances, however, an arrest is mandatory.  ORS 133.310(3)-(6).  One such circumstance involves the

violation of a restraining order issued pursuant to FAPA:

> (3) A peace officer *shall* arrest and take into custody a person without a warrant when the peace officer has probable cause to believe that:
>> (a) There exists an order issued pursuant to ORS . . .107.718 . . . restraining the person;
>> (b) A true copy of the order and proof of service on the person has been filed as required in ORS 107.720 . . .; and
>> (c) The person to be arrested has violated the terms of that order.

ORS 133.310(3) (emphasis added).

A peace officer who fails to comply with the mandatory arrest requirement of

ORS 133.310(3) may be held liable in a tort action for damages sustained due to that failure.

*Nearing v. Weaver*, 295 Or 702, 670 P2d 137 (1983).

### B.    Analysis

The 2005 Restraining Order was issued pursuant to ORS 107.718 and was served and

filed as required in ORS 107.720.  Therefore, the essential question is whether Officer Wolfe and

Sergeant Spang had probable cause to believe that Mr. Houston had violated the terms of the

2005 Restraining Order.  If they did, then Oregon law required them to arrest Mr. Houston.

ORS 133.310(3).

There is no doubt that Officer Wolfe had probable cause to arrest Mr. Houston.

According to the uncontradicted evidence, at the time of Mr. Houston's arrest, Officer Wolfe had

reviewed the various Judgments and the 2005 Restraining Order that were in effect between Ms.

Houston and Mr. Houston.  He had information from Officer Brown that Mr. Houston had gone to

his son's school, and, once there, had come within 100 yards of  Ms. Houston.  He knew that both

of these acts were forbidden by the 2005 Restraining Order unless they fell within an exception.

Finally, when Officer Wolfe met Mr. Houston at the Beaverton Police Station on May 5, 2006,

Mr. Houston admitted to Officer Wolfe that he had attended the conference and saw Ms. Houston

there, though he claimed the contact was unintentional and permissible under the terms of the

13 - FINDINGS AND RECOMMENDATIONS

various court orders.  Given the reliable information from another peace officer and the admission of the Mr. Houston, Officer Wolfe had probable cause to arrest Mr. Houston for violating the 2005 Restraining Order unless Mr. Houston's conduct fell within an exception to its terms.

The only exception to the 2005 Restraining Order was allowing Mr. Houston to continue parenting time "as determined through divorced [*sic*]."  The 2003 Judgment permitted Mr. Houston to attend parent-teacher conferences under a section labeled "Custody and Parenting Time."  The 2005 Judgment, which was in effect on the date of the school visit, expressly amended the "Parenting Time" permitted under the 2003 Judgment and contained no provision permitting Mr. Houston to go to Zachary's school.  Further clarifying its reach, the 2005 Judgment stated:  "This parenting plain contained in this Judgment supercedes the parenting plan contained in all prior Judgments in this case."

In light of the plain language of the 2005 Judgment and 2005 Restraining Order, it was reasonable for Officer Wolfe to conclude that Mr. Houston had no right to attend the parent-teacher conference or to come within 100 yards of Ms. Houston at the school.  Viewed objectively, these documents, plus the information given to Officer Wolfe by Officer Brown and Mr. Houston himself, provided probable cause to arrest Mr. Houston.  Officer Wolfe had reasonably trustworthy information sufficient to warrant a prudent person in believing that Mr. Houston had committed the offense of violating a restraining order.  Once he had sufficient information to provide probable cause that Mr. Houston had violated the terms of the 2005 Restraining Order, Officer Wolfe was required to arrest Mr. Houston pursuant to ORS 133.310(3).

Mr. Houston has offered no contradictory evidence.  Mr. Houston instead argues that the officers, in bad faith, failed to give him an opportunity to produce exculpatory evidence.  However, he states that this exculpatory evidence was the 2003 Judgment which Officer Wolfe

had already reviewed prior to making the arrest. Despite defendants' requests, Mr. Houston has failed to present any other evidence supporting his right to attend the parent-teacher conference.

Mr. Houston also challenges Officer Wolfe's interpretation of the 2005 Judgment as eliminating his right had to attend parent-teacher conferences under the 2003 Judgment. According to Mr. Houston, Officer Wolfe could have just as easily interpreted the superceding order to remove all restrictions in the 2003 Judgment, and not just those pertaining to school visitation. This argument demonstrates a lack of understanding about the 2003 Judgment. The 2003 Judgement generally prohibits Mr. Houston from contacting Ms. Houston and Zachary except as otherwise permitted by its various provisions. Most of these permissive provisions are contained in the section entitled "Custody and Parenting Time." The 2005 Judgment expressly supercedes the permissive provisions of this section, substituting them with different and, notably, more restrictive provisions that do not include a right to attend parent teacher conferences. A prudent person reading these documents could conclude that notwithstanding any provision in the "Custody and Parenting Time" section of the 2003 Judgment, any contact not permitted by the 2005 Judgment would not fall within the parenting time exception in 2005 Restraining Order. When Mr. Houston had contact outside of the provisions of the 2005 Judgment, it was objectively reasonable for Officer Wolfe to conclude he violated the 2005 Restraining Order.

///

This is not to say that the various court orders at issue here are free from all ambiguity in their proper interpretation. However, the probable cause analysis requires only that the information available to the officer at the time of the arrest, viewed objectively, presented a fair probability that the defendant had committed a crime. The information available to Officer Wolfe at the time he arrested Mr. Houston provided this information.

### C.    Conclusion

15 - FINDINGS AND RECOMMENDATIONS

Because Officer Wolfe had probable cause to arrest Mr. Houston, Officer Wolfe and

Sergeant Spang[2] did not violate his Fourth Amendment right to be free from unreasonable

seizures when they arrested him for violating the 2005 Restraining Order pursuant to

ORS 133.310(3).  The motion by Officer Wolfe and Sergeant Spang should be granted.  As a

result, this court need not address whether Officer Wolfe and Sergeant Spanger are protected by

qualified immunity.  *Saucier v. Katz*, 533 US 194, 201 (2001).

II.    **Claims Against Ms. Houston and Mr. Fowler**

Mr. Houston's second and third claims are brought against his ex-wife Ms. Houston and

her friend, Mr. Fowler, for false imprisonment and IIED.  Because the officers had probable cause

to arrest Mr. Houston, Ms. Houston and Mr. Fowler argue that they cannot be held liable for the

role they played in his arrest and detention.

A.    **False Imprisonment (Second Claim)**

1.    **Legal Standards**

The "gravaman" of a claim for false imprisonment is "the unlawful imposition of restraint

on another's freedom of movement."  *Hiber v. Creditors Collection Serv. of Lincoln County, Inc.*,

154 Or App 408, 413, 961 P2d 898, 901 (1998), *review denied*, 327 Or 621, 971 P2d 413 (1998),

*quoting Buckel v. Nunn*, 133 Or App 399, 405, 891 P2d 16, 21 (1995).  Its elements are "(1) [the]

defendant must confine [the] plaintiff; (2) [the] defendant must intend the act that causes the

confinement; (3) [the] plaintiff must be aware of the confinement; and (4) the confinement must

be unlawful."  *Id*.  To be liable, "the defendant 'must only intend to accomplish the act that causes

confinement; they need not intend the confinement to be unlawful.'"  *Carr v. City of Hilsboro*,

---

[2]  Sergeant Spang contends that his involvement in the case was too minimal to expose
him to liability.  Because Officer Wolfe had probable cause to arrest Mr. Houston, the court need
not reach this issue.

497 F Supp2d 1197, 1211 (D Or 2007), *quoting Oviatt By and Through Waugh v. Pearce*, 954

F2d 1470, 1479 (9th Cir1992) (interpreting Oregon law).  Under Oregon law "generally a person

can be liable for false imprisonment for instigating the imprisonment of another person falsely,

even if the person does not participate physically or directly in the confinement."  *Stone v.*

*Finnerty*, 182 Or App 452, 468, 50 P3d 1179, 1190 (2002), *modified on recons*., 184 Or App 111,

55 P3d 531 (2002), *review denied*, 335 Or 422, 69 P3d 1233 (2003).  The plaintiff has the initial

burden of showing imprisonment.  *Ross v. City of Eugene,* 151 Or App 656, 663, 950 P2d 372,

375 (1997).  Once the plaintiff makes this showing, the defendant must show the imprisonment

was not unlawful.  *Id.*

      Where the basis for an unlawful imprisonment claim is an unlawful arrest, probable cause

is ordinarily a complete defense.  *Bacon v. City of Tigard*, 81 Or App 147, 149-50, 724 P2d 885,

886 (1986).  However, where probable cause is based in part on false information provided by the

defendant, probable cause is not a defense unless it would have existed even without the false

information provided by the defendant.  *See*, *Stone*, 182 Or App at 468-71, 50 P3d at 1190-92

(affirming a directed verdict on an unlawful imprisonment claim, where, after excising alleged

false statements by the affiant police officer from the affidavit, probable cause still existed to

support the search warrant pursuant to which the plaintiffs were detained while their house was

searched).

      On the other hand, where the detention by police officers is ultimately found to be

unlawful, merely giving police information which leads to the plaintiff's unlawful imprisonment

is insufficient to render the informant liable.  *Id* at 468, 50 P3d at 1190-91.

> One who participates in an unlawful arrest, or procures or instigates the
> making of one without proper authority, will be liable for the
> consequences; but the defendant must have taken some active part in
> bringing about the unlawful arrest itself, by some "affirmative direction,
> persuasion, request or voluntary participation." There is no liability for

> merely giving information to legal authorities, who are left entirely free to use their own judgment, or for identifying plaintiff as the person wanted, or requesting a proper arrest when an officer makes an improper one instead, or swearing to a complaint before a magistrate who turns out not to have jurisdiction." (footnotes omitted)

*Id*, *quoting* William Prosser, TORTS, 52 (5th ed 1984).

The Oregon Supreme Court has framed the issue in terms of "whether the defendant instigated an arrest without a warrant, and, if so, whether the defendant had justification to instigate the arrest." *Pearson v. Galvin*, 253 Or 331, 335, 454 P2d 638, 640 (1969). The plaintiff bears the burden of showing the arrest and that the defendant was the instigator. *Id* at 337, 454 P2d at 641. Once he has made this showing, the burden shifts to the defendant to show that the arrest was justified. *Id*.

In *Pearson*, the Oregon Supreme Court quoted with approval the definition for "instigation" provided by RESTATEMENTS (SECOND) OF TORTS § 45A, Comment c.:

> Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of 'Officer, arrest that man!' It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

*Id* at 335; 454 P2d at 640 (elipses omitted).

///

The defendant in *Pearson* falsely reported that his plane had been stolen after getting into a civil dispute with the plaintiff about its use. Based upon this complaint, the police arrested the plaintiff. The court held that the trial court erroneously directed a verdict for the defendant on an unlawful imprisonment claim where "the jury was entitled to conclude that the information which the defendant did give the police reasonably could have been expected to result in the plaintiff's arrest[,]" because "such a conclusion would support a finding that the defendant instigated the

arrest." *Id* at 336, 454 P2d at 641.

The court also rejected the intervening acts defense by which the defendant sought to be relieved of liability because the state police failed to recall their officer once the civil nature of the dispute was made known.  The court stated that "[t]he plaintiff [was] not required to prove that the defendant was the sole, or exclusive, instigator of his arrest, but that the defendant participated by taking an active part in bringing about the arrest." *Id* at 337, 454 P2d at 641.  The court reasoned that "[t]he arrest of the plaintiff was a wholly foreseeable event, given the defendant's report that the aircraft had been stolen and the withholding by the defendant of the fact that the defendant knew the identity of the person flying the plane."  *Id.*

The court then proceeded to the next portion of the analysis to determine whether the defendant was justified in instigating the arrest.  On this issue, the court found that the record would have permitted the jury to find that the defendant did not have probable cause to believe the plaintiff had committed a felony when he reported the plane stolen.

### 2.  <u>Analysis</u>

#### a.  <u>Ms. Houston</u>

Mr. Houston alleges that Ms. Houston "encouraged, instigated, or otherwise participated in the events and circumstances that led to the restraint of Plaintiff Ben Houston with malice, fraud and ulterior motives."  SAC, ¶ 52.  He further alleges that Ms. Houston "specifically participated" in his unlawful imprisonment "by filing a false police report that contained misrepresentations of fact and omissions of fact, relevant to an investigation of the claims alleged in the report."  *Id* at ¶ 53.  Specifically he alleges that she made the following false statements:

> 1) That [Zachary's school] had a "flag" in its computer system that indicates that Plaintiff Ben Houston should not be at the school, and that if he is seen, Defendant Ms. Houston should be telephoned; 2) That the School did telephone her that day; 3) That the school left her a message and that she did not get the message because she was at work; 4) That Plaintiff

> Ben Houston had *supervised* visitation with Zachary Houston; 5) Failed to explain that Plaintiff Ben Houston had authority to attend parent-teacher conference according to the terms of the Restraining Order or other Court Order; and 6) Failed to explain that Plaintiff Ben Houston was unaware of her presence at the conference, and immediately retreated from her presence upon discovering her there.

*Id* at ¶ 21 (emphasis in original).

Given that she repeatedly made allegations that Mr. Houston had violated the 2005 Restraining Order, there is a genuine issue of fact as to whether Ms. Houston instigated Mr. Houston's warrantless arrest. Therefore, the burden switches to her to show that she was justified in doing so. As justification, Ms. Houston relies upon the fact that Officer Wolfe had probable cause to arrest Mr. Houston for violating the 2005 Restraining Order.

Ms. Houston reported to police three separate contacts that she believed violated her restraining order: the parent-teacher conference at Zachary's school, a call on March 21, 2006, and a call on April 21, 2006. Officer Wolfe's determination of probable cause was based only on the first two contacts, as the third was authorized by changes made to the terms of the divorce by the April 20, 2006 Judgment. Therefore, in order to avoid summary judgment on this claim, Mr. Houston must provide some evidence that Ms. Houston made material misrepresentations in these reports upon which Officer Wolfe relied in determining that probable cause existed to arrest Mr. Houston, and that in the absence of these misrepresentations a material issue of fact remains as to whether Officer Wolfe had probable cause to arrest Mr. Houston.

Mr. Houston has submitted no evidence to support his allegations that Ms. Houston made intentional misrepresentations or omissions of material facts in her police reports. Furthermore, he has failed to explain how her alleged misrepresentations could have effected the officers' probable cause determination in light of the fact that he admitted the primary contact for which Officer Wolfe arrested him. The misrepresentations he does allege either concern immaterial

issues that could have had no effect on the officer's decision to arrest him (*e.g.*, whether there is a "flag" in the school computer system or whether his parenting time is "supervised"), merely repeat his own incorrect legal conclusions (*e.g.*, Ms. Houston "[f]ailed to explain that Plaintiff Ben Houston had authority to attend parent-teacher conference according to the terms of the Restraining Order or other Court Order."), or attempt to place his own version of the facts in Ms. Houston's mouth (*e.g.*, Ms. Houston "[f]ailed to explain that Plaintiff Ben Houston was unaware of her presence at the conference, and immediately retreated from her presence upon discovering her there.").

The uncontradicted evidence shows that Ms. Houston reported her belief to the police that Mr. Houston violated the terms of the 2005 Restraining Order on three occasions. One of these incidents turned out to be unsubstantiated due to an almost contemporaneous change in the terms their divorce; another Mr. Houston has not denied; and as to the third, Mr. Houston has admitted all the material underlying facts, though he disputes their legal import. That Ms. Houston may have omitted or misrepresented a few of the immaterial facts in this final report does not negate the probable cause finding made by Officer Wolfe.

///

### b.    **Mr. Fowler**

Mr. Houston alleges that Mr. Fowler also "encouraged, instigated, or otherwise" participated in effecting his warrantless arrest. SAC, ¶ 52. Specific to Mr. Fowler, Mr. Houston alleges that he participated in his unlawful imprisonment

> by using his position as a former police officer to persuade and put pressure
> upon the arresting officer to effectuate an arrest of Plaintiff Ben Houston;
> by lending credibility to the false and incredible claims of Defendant Ms.
> Houston; by bringing to the attention of the arresting officers a police
> report that he knew, or should have known, was false, which was filed six
> weeks earlier, and that otherwise would have been disregarded or ignored;

and by insisting that Plaintiff Ben Houston be arrested.

*Id* at ¶ 54.

Mr. Houston has offered no evidence to support these allegations. In contrast, Officer Wolfe declares that "Mark Fowler had nothing to do with [his] arrest of Mr. Houston." Wolfe Decl., ¶ 22. Therefore, Mr. Houston has failed to raise a material issue of fact on the issue of whether Mr. Fowler instigated his arrest.

Even if this court concluded that the unsubstantiated claims in the SAC were sufficient to survive summary judgment at the first step of the *Pearson* analysis, the fact remains that Mr. Houston's arrest was justified by Officer Wolfe's probable cause determination which, based on the uncontradicted evidence, shows a sufficient legal basis independent of any actions of Mr. Fowler.

### 3. **Conclusion**

Because no issue of material fact exists as to the unlawfulness of his imprisonment, the fourth element of his false imprisonment claim fails. Therefore, summary judgment should be granted with respect to Mr. Houston's Second Claim against Ms. Houston and Mr. Fowler.

///

### B. **Intentional Infliction of Emotional Distress (Third Claim)**

#### 1. **Legal Standards**

To prove an IIED claim, Oregon law requires the plaintiff to prove three elements:

> (1) that [the] defendant[] intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that [the] defendant[] engaged in outrageous conduct- i.e., conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that [the] defendant['s] conduct in fact caused plaintiff severe emotional distress.

*Checkley v. Boyd*, 198 Or App 110, 124, 107 P3d 651, 660 (2005), *citing McGanty v.*

*Staudenraus*, 321 Or 532, 543, 550, 901 P2d 841, 852 (1995).

At the core of every IIED claim is the requirement that the behavior engaged in be "outrageous in the extreme."  *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or App 234, 239, 828 P2d 479, 481 (1992).  It is axiomatic that "[c]onduct that is merely rude, boorish, tyrannical, churlish and mean does not satisfy that standard, nor do insults, harsh or intimidating words, or rude behavior ordinarily result in liability even when intended to cause distress."  *Id* (internal citations, quotations, and ellipsis omitted); *see also*, *Christofferson v. Church of Scientology of Portland*, 57 Or App 203, 212-13, 644 P2d 577, 585 (1982) ("It is only by proof of conduct that is 'beyond the limits of social toleration' that plaintiff may recover in an action for outrageous conduct, no matter what defendants may have intended and no matter what the effect on plaintiff may have been.")

Whether conduct is outrageous in the extreme "is a fact specific inquiry" to be analyzed "on a case-by-case basis, considering the totality of the circumstances involved, to determine whether it constitutes an extraordinary transgression of the bounds of socially tolerable conduct." *Buckel v. Nunn*, 133 Or App 399, 404, 891 P2d 16, 20 (1995) (citation and internal quotations omitted).  However, initially "[i]t is a question of law whether, viewing the evidence in the light most favorable to plaintiff, defendants' conduct constitutes 'extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior.'"  *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 517, 873 P2d 413, 417 (1994), *review dismissed*, 321 Or 561, 901 P2d 859 (1995), *quoting Hall v. The May Dep't Stores*, 292 Or 131, 137, 637 P2d 126, 130 (1981)), *overruling on other grounds recognized by Patrick ex rel. Estate of Patrick v. State*, 178 Or App 97, 36 P3d 976 (2001).  Therefore, summary judgment is appropriate on this issue only if no material issue of fact would permit a jury to find that the conduct of Ms. Houston and Mr. Fowler was outrageous.

23 - FINDINGS AND RECOMMENDATIONS

2.    **Analysis**

Mr. Houston's claim for IIED against Ms. Houston and Mr. Fowler rests on the identical allegations made in his false imprisonment claim.  SAC, ¶¶ 68-69.  Primarily he alleges that Ms. Houston made misrepresentations of fact in her police reports and Mr. Fowler used his position as a retired police officer to influence the defendant officers to arrest Mr. Houston.  To Mr. Houston, their efforts in getting him arrested constitute the outrageous conduct necessary to support his IIED claim.

Again, both Ms. Houston and Mr. Fowler join in the motion by Officer Wolfe and Sergeant Spang for summary judgment and rely upon the facts asserted in those officers' declarations.  The uncontroverted facts established by these declarations and supporting documents demonstrate that Ms. Houston and Mr. Fowler did not engage in any socially intolerable conduct in this case, and even if they did, their conduct was not the cause of any distress Mr. Houston suffered due to his arrest and incarceration.

As discussed above, Mr. Houston has provided no evidence that Ms. Houston made any misrepresentations to the police that were material to their decision to arrest him.  That Ms. Houston may have omitted or misrepresented a few immaterial facts in her reports does not constitute conduct that is "outrageous in the extreme."

With respect to Mr. Fowler, Mr. Houston's claim fails as well.  Mr. Houston has presented no evidence that Mr. Fowler put pressure on Officer Wolfe to arrest him for violating the 2005 Restraining Order.  Furthermore, Officer Wolfe affirmatively states that Mr. Fowler was not the person who brought Officer Brown's police report to his attention, and, indeed, he played no part in Officer Wolfe's decision to arrest Mr. Houston.  In light of these uncontradicted facts, the court has no evidence of Mr. Fowler's involvement at any point in this case, much less evidence of

outrageous conduct committed by Mr. Fowler.

Finally, even if this court accepted Mr. Houston's allegations as true, the fact remains that regardless of any conduct by Ms. Houston and Mr. Fowler, the severe distress Mr. Houston allegedly endured stems entirely from his arrest and incarceration. Officer Wolfe chose to arrest Mr. Houston based upon his own independent review of the facts and various court orders and upon Mr. Houston's own confession. Absent from Officer Wolfe's declaration is any indication that his decision to arrest was based on any of the allegedly false statements made by Ms. Houston, and Officer Wolfe affirmatively denies any influence from Mr. Fowler. Therefore, any severe distress suffered by Mr. Houston was due only to Officer Wolfe's own independent decision to arrest him based, in large part, upon Mr. Houston's own admission. Thus, even if this court found that Ms. Houston and Mr. Fowler engaged in outrageous conduct, their conduct did not "in fact cause [Mr. Houston's] emotional distress." *Checkley* 198 Or App at 124, 107 P3d at 660.

///

///

### 3.    <u>Conclusion</u>

Mr. Houston has failed to raise an issue of material fact from which a jury could find that Ms. Houston and Mr. Fowler engaged in outrageous conduct and that their conduct caused his emotional distress. Therefore, their motion for summary judgment with respect to the Third Claim should be granted.

## III.    <u>Claim Against Washington County, Juan Elenes and Davidson Greaves (Fourth Claim)</u>

### A.    <u>Allegations</u>

Mr. Houston's final claim asserts that Washington County, Elenes, and Greaves

(collectively "county defendants") violated his Fourth Amendment right to be free from unreasonable searches.  Mr. Houston alleges that he was shackled, strip searched, and had his body cavities searched at the Washington County Jail by Elenes and Greaves.  SAC, ¶ 35.  He further avers that they lacked reasonable suspicion that he possessed weapons or contraband when this occurred.  *Id* at ¶ 75.  This search, he alleges, occurred pursuant to Washington County's Jail Policy J-14-4 and failure to properly train, supervise, or discipline its officers.  *Id* at ¶¶ 78-80.

Although not clear from the SAC, Mr. Houston argues that the body cavity search was not just visual, as required by Washington County's strip search policy, but also digital.  He claims this digital search did not occur in private, was performed without probable cause, and did not involve medical personnel as required by the jail policy.  Due to this strip search, he alleges that he suffered emotional pain and suffering, humiliation, embarrassment, worry, fear, anguish, shock, nervousness and anxiety.  *Id* at ¶¶ 82-83.

Greaves admits he made the determination that Mr. Houston "should be strip searched according to [jail policy] based upon the fact that he had been held at another detention facility."  Greaves Decl., ¶ 9.  At that time he was aware that Mr. Houston had been held in a holding room at the Beaverton Police Department and "could have had contact with other arrestees during that time."  *Id* at ¶ 7.  As noted above, Greaves was also aware of the fact that Mr. Houston had been arrested for violating a restraining order, could not post the required amount of security, could not be force released or released on his own recognizance, and, therefore, would have to be dressed in and lodged in the jail until he was able to post security or see a judge.

Elenes performed the strip search, but has no independent memory of the events surrounding the search, or the manner in which the search was conducted.  His testimony relies entirely on an entry in his duty notebook from which he can confirm that he strip searched Mr. Houston, and that nothing unusual occurred.

26 - FINDINGS AND RECOMMENDATIONS

The county defendants have submitted no facts from someone with personal knowledge of the specific details of Mr. Houston's stip search. Instead, they submit facts which give the rationale supporting Mr. Houston's strip search, recite the general procedures and policies employed in strip searches at the county jail, and indicate no record of anything unusual happening during Mr. Houston's search.

**B.    Jail Policy**

Washington County Jail Policy J-14-4[3] governs inmate searches in the Washington County Jail. The policy defines various terms, dictates general search procedures, and sets forth different types of searches and the conditions under which jail staff may conduct them. Wash. County Memo, Exhibit 3. A "dress-in" means "[t]o physically prepare a person for jail lodging. It includes showering, changing into jail clothing, accounting for personal property, and strip search (if called for)." *Id* at 1. A "[s]trip search" includes a visual body cavity search:

> The visual inspection of a nude person to detect contraband or medical conditions. It includes a visual exam of all body cavities, including the genitals and anus. The person is not touched in any manner during the search, unless it is a forced search. It also includes the touching and visual inspection of disrobed clothing.

*Id* at 2.

The policy permits strip searches only in specific circumstances. Relevant to this case the policy provides:

_____

[3] Washington County has failed to properly authenticate its Exhibit 3 as a true and accurate copy of Washington County Jail Policy J-14-4. Furthermore, although the document is dated July 15, 2005, Washington County has submitted no evidence that this version was in effect on May 5, 2006, when Mr. Houston was lodged at the jail. However, Mr. Houston has not objected to, and indeed submits and relies upon the same document in support of his Response. Therefore, the court will accept it for purposes of this motion. The court will not, however, consider Exhibit 1 in support of Washington County's motion as it consists of police reports which are not authenticated and contain inadmissible hearsay. FRCP 56(e).

18.   Conditions for Strip Searches
Deputies will strip search an arrestee or inmate under the following
conditions:

\* \* \*

d.  When searches further legitimate penological interests, which
include but are not limited to the following:

\* \* \*

(3) When coming in on a transport from another correctional
or detention facility.

*Id* at 6-7.

When conducting the search, deputies must ordinarily take steps to protect a prisoner's

privacy by conducting the strip search "out of the sight of other inmates not being searched at the

same time as visitors, and staff who do not have a work need to be present."  *Id* at 7.  The policy

requires that when an inmate is strip searched at dress-in, the deputy must document the search in

their duty notebook and in a dress-in record.  *Id* at 8-9.

Strip searches are conducted in the "dress in room."  Elenes Decl., ¶ 6.  The normal

practice is to take two to three inmates into the dress-in room and strip search them together.  *Id*.

While being strip searched, the inmates are within a few feet of each other, but are visually

screened from each other's view.  *Id*.  The intake corporal makes the determination of whether to

strip search an inmate.  *Id* at ¶ 9.  The intake corporal and several other police officers are able to

hear the dress-in deputy give commands to the inmate during dress-in.  Greaves Decl., ¶¶ 12-13.

The policy defines "[d]igital body cavity search" as "[t]he use of a gloved finger or

instrument to check the insides of a body opening (usually the rectum or vagina) to detect

contraband."  Wash. County Memo, Exhibit 3, p. 1.  A digital body cavity search is permitted

"[i]f staff have reasonable suspicion that an inmate (or arrestee) is concealing contraband in a

body cavity."  *Id* at 8.  It must be authorized by a jail sergeant or commanding officer, may only

be conducted by a "medically trained person," and must occur in private.  *Id*.  An officer who

conducts a digital body cavity search must document the search in their duty notebook and in a

28 - FINDINGS AND RECOMMENDATIONS

Jail Incident Report along with a notation in "Tiburon" (presumably a computer records system). *Id.* The policy requires "[i]n addition to normal report information, the incident report must include the justification, name of the qualified person doing the search, and what was found, if anything." *Id* at 9.

### C.    Fourth Amendment Violation

For Mr. Houston to prevail on his Fourth Claim under § 1983, he must prove he was deprived of a right secured by the Constitution or laws of the United States and that this deprivation was caused by state action. *Monell v. Dep't of Social Servs.,* 436 US 658, 690-95 (1978). Mr. Houston alleges that the strip search performed by Elenes pursuant to Washington County's policy violated his Fourth Amendment right to be free from unreasonable searches. There is no question of state action in this case.

The county defendants raise multiple defenses to Mr. Houston's claim. Greaves and Elenes claim qualified immunity pursuant to *Harlow v. Fitzgerald*, 457 US 800 (1982), and *Saucier v. Katz*, 533 US 194 (2001), and Washington County asserts that Mr. Houston has failed to prove that the county may be held liable under *Monell*. Both of these doctrines depend upon the existence of a constitutional violation. Therefore, the court will first address the question of whether, taking the facts in the light most favorable to Mr. Houston, the county defendants violated his Fourth Amendment right to be free from unreasonable searches. *See*, *Saucier*, 533 US at 201 (whether a constitutional violation occurred is "threshold issue" for application of qualified immunity).

### 1.    Legal Standards

To prove a Fourth Amendment claim for unreasonable search under § 1983, a plaintiff must prove that the search conducted by the state actor was unreasonable. *Bell v. Wolfish*, 441

US 520, 558 (1979).  In *Bell*, the Supreme Court set forth the analysis to be used for determining

the reasonableness of the search of a pre-trial detainee:

> The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.  In each case it requires a
> balancing of the need for the particular search against the invasion of
> personal rights that the search entails.  Courts must consider the scope of
> the particular intrusion, the manner in which it is conducted, the
> justification for initiating it, and the place in which it is conducted.

*Id* at 559.

Using this fact intensive analysis, the Ninth Circuit has spent the better part of three

decades deciding the reasonableness of searches conducted under a wide variety of

circumstances, and has formulated some bright-line rules for circumstances in which a search of a

pre-trial detainee is never reasonable.

Beginning with *Giles v. Ackerman*, 746 F2d 614 (1984) (*per curium*), *overruled on other*

*grounds by Hodgers-Durgin v. De la Vina*, 199 F3d 1037, 1040 n1 (9th Cir 1999) (*en banc*), the

court held that "arrestees for minor offenses may be subjected to a strip search only if jail officials

have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or

suffering from a communicable disease."  *Id* at 615.  Therefore, the strip search of an arrestee

detained for a minor traffic violation violated the Fourth Amendment where:  the search was

incident to a blanket county policy which did not require reasonable suspicion that she was

carrying contraband; her offense was minor; she was cooperative with arresting officers

throughout her arrest; the officer admitted that but for the policy he would not have searched her;

and the county could not demonstrate that "its security interests warrant[ed] the serious invasion

of privacy inflicted by its policy."  *Id* at 617-18.

The court reiterated the rule of *Giles* in *Ward v. County of San Diego*, 791 F2d 1329, 1333

(9th Cir 1986), where it held that a visual body cavity search pursuant to a blanket strip search

policy on persons arrested for a minor misdemeanor offense, and conducted prior to a determination of whether the arrestee could be released on her own recognizance, violated the Fourth Amendment unless the defendant could show it was reasonable under the circumstances.

Next in *Vaughan v. Ricketts*, 859 F2d 736, 741 (9th Cir 1988), *implied overruling on other grounds recognized by Act Up!/Portland v.* Bagley, 971 F2d 298, 301 (9th Cir 1992), the court held that the reasonableness standard of *Bell* applied not only to the justification of the search, but also the manner in which the search was conducted. Therefore, prison officials violated inmates' Fourth Amendment rights by subjecting them to otherwise reasonable digital body cavity searches in a manner that ignored legitimate issues of privacy, hygiene and safety. *Id*.

A visual body cavity search of a person did not violate the Fourth Amendment in *Thompson v. City of Los Angeles*, 885 F2d 1439 (9th Cir 1989). In *Thompson*, the plaintiff was arrested for grand theft auto and spent the night in a sheriff's station before being transferred to the county jail. Once at the jail he was subjected to a strip search, blood test, and x-ray pursuant to jail policy which required these of all new admittees to the jail. The plaintiff was released after spending five days in the jail and was never prosecuted on the charge.

///

The court employed the *Bell* balancing test in determining whether the jail's "extremely weighty" interest in preventing the introduction of weapons and contraband outweighed the plaintiff's significant privacy interests. *Id* at 1446. After reviewing the holdings of multiple cases, the court found that "[c]ourts invalidating strip search policies as applied to traffic and other non-violent offenders have generally held that in order to strip search such arrestees, the arresting officers must have reasonable individualized suspicion that an arrestee is carrying or concealing contraband." *Id* (citing cases). This individualized suspicion "may be based on such factors as the 'nature of the offense, the arrestee's appearance and conduct, and the prior arrest

31 - FINDINGS AND RECOMMENDATIONS

record.'"  *Id*, *quoting Giles*, 746 F2d at 617.  Although a factor in the analysis, the court found that the fact that the plaintiff would be placed into the general jail population was insufficient on its own to justify a strip search.  Ultimately, the court held that the analysis "hing[ed] upon the nature of the grand theft auto offense with which Thompson was charged."  *Id* at 1447.  Finding that the grand theft auto offense was "sufficiently associated with violence" based upon "the continuum established by prior cases," the court held the visual strip search was justified.  *Id*.

In *Kennedy v. Los Angeles Police Dept.*, 901 F2d 702, 716 (9th Cir 1990), *overruled on other grounds*, *Hunter v. Bryant*, 502 US 224, 589 (1991), the court addressed a blanket strip search policy that subjected all felony arrestees to visual body cavity searches.  Applying the *Bell* balancing test, the court found that in light of the "dehumanizing and degrading" nature of the search, the police department failed to give sufficient justification to strip search all felony arrestees regardless of the level of suspicion, including those whose crimes did not involve violence or drug possession.  Recognizing that "in some cases, the charge itself may give rise to reasonable suspicion," this was not the case where the arrest was a felony theft charge stemming from a property dispute.  *Id* at 716, *citing Thompson*, 885 F2d at 1447.

In *Fuller v. M.G. Jewelry*, 950 F2d 1437, 1446-47 (1991), the court reached the same conclusion regarding a visual strip search based upon the same policy at issue in *Kennedy*.  From an extensive review of case law, the court deduced "that strip and body cavity searches of detainees may be conducted based on reasonable suspicion only where such searches are necessary to protect the overriding security needs of the institution – that is, where officials have a reasonable suspicion that a particular detainee harbors weapons or dangerous contraband."  *Id* at 1447.  In *Fuller*, it was not clear whether the plaintiff was ever incarcerated with the general population during her detention at the police department which would have triggered the institutional security justification.  Instead, the defendants' asserted justification was that officers

were searching for evidence of the plaintiff's alleged crime (a stolen ring) which they believe could be hidden on her person. In these circumstances, the court held that the search could only be justified by a warrant supported by probable cause. *Id* at 1448-50.

Finally, just two weeks before the events at issue here, the Ninth Circuit decided *Way v. County of Ventura*, 445 F3d 1157 (9th Cir 2006). Among the questions in *Way* was "whether a strip search with a visual cavity inspection can be justified based on Ventura County's blanket strip-search policy allowing such a search for arrestees charged with any controlled substance offense before placement in the general jail population." *Id* at 1158. In an opinion that synthesized all of the prior case law, the court held that the search was not justified.

The plaintiff in *Way* had been arrested for being under the influence of methamphetamine, a misdemeanor under California law. While being booked in to the Ventura County pretrial detention facility, she was subjected to a visual body cavity search pursuant to a county policy requiring such searches of all persons arrested on misdemeanor drug charges. Shortly after being searched, the plaintiff was placed in a holding cell with several other women. She was released a few hours later after posting bail without ever entering the jail's general population.

Employing the *Bell* balancing test, the court recognized "the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference [owed] jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security." *Id* at 1161, *citing Bell*, 441 US at 546-47, 559. "However," the court noted, "this does not mean that a blanket policy is constitutionally acceptable simply by virtue of jail officials' invocation of security concerns." *Id*. "Rather, the policy must be 'reasonably related' to the [detention facility's] interest in maintaining security." *Id*.

The court found that the defendants failed to show this link. The defendants asserted that all drug offenses involved "heightened security concerns" due to the increased likelihood that

those charged will bring drugs with them into the institution.  *Id.*  The court agreed that in some

cases the charge itself may give rise to reasonable suspicion.  However, the court could not "see

how the charge of being under the influence of a drug necessarily poses a threat of concealing . . .

additional drugs in jail during the limited time between booking and bail, or booking and

placement in the general population."  *Id* at 1162.  This was especially true where the plaintiff had

been under the control of the arresting officer at all times prior to booking.  The court concluded:

> As there is no evidence that security concerns require strip searching all
> arrestees on all drug offenses before placement in the general jail
> population, and none that all persons arrested for being under the influence
> of a drug are likely to have concealed more drugs in a bodily cavity, the
> Sheriff Department's blanket policy cannot be a proxy for reasonable
> suspicion. There was no individualized suspicion that Way concealed drugs
> in a bodily cavity. Therefore, subjecting her to a strip search with visual
> cavity inspection offended her constitutional right to be free of an
> unreasonable search.

*Id.*

///

### 2.    Analysis

Using the four part analysis set forth by the court in *Bell*, this court must weigh the county

defendants' asserted need for conducting the strip search of Mr. Houston with the invasion of

Mr. Houston's rights.

### a.    Scope of Intrusion

In determining the extent of the search, the court must first determine exactly what kind of

body cavity search occurred:  visual or digital.  The SAC alleges that Mr. Houston was subjected

to a strip search and a body cavity search, but does not specifically allege the cavity search was

digital.  The county defendants admit that Mr. Houston was subjected to a visual body cavity

search.  Furthermore, they have provided evidence that nothing unusual occurred during the

course of this search.  Although Elenes, who conducted the search, has no independent memory of the particular search at issue, his review of his duty notebook indicates that nothing out of the ordinary occurred beyond the usual strip search.  The county policy requires the use of special procedures and the creation of specific records whenever the usual strip search is expanded to include digital inspection.

Mr. Houston contends for the first time in opposition to the county defendants' motion that the body cavity search alleged in the SAC was digital.  He further contends that the digital cavity search was not conducted in private and was performed without the presence of trained medical personnel.  However, Mr. Houston has submitted no evidence to support these contentions.

The law is clear that a party cannot defeat motion for summary judgment with mere assertions in legal memoranda.  *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F2d 1235, 1238 (9th Cir 1982).  Furthermore,

> [i]f a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own.  If in that circumstance the plaintiff fails to produce evidence, the district court is not required (or even allowed) to assume that the challenged factual allegations in the plaintiff's complaint are true.  Similarly, if in that circumstance the plaintiff produces evidence that is not enough, by itself, to create a genuine issue of material fact, the district court is not required (or even allowed) to assume the truth of challenged allegations in the complaint in order to supplement that evidence.

*Butler v. San Diego District Attorney's Office*, 370 F3d 956, 963  (9th Cir 2004) (citing cases).

The county defendants have submitted sufficient evidence to force Mr. Houston to go beyond his pleadings and provide some evidence of a genuine issue of fact as to the type of body cavity search conducted.  He has failed to do so.  Even if the SAC can be construed to allege that Mr. Houston was subjected to a digital body cavity search, this court cannot accept that allegation as true.  Mr. Houston has failed to provide evidence to refute the county defendants' evidence as

35 - FINDINGS AND RECOMMENDATIONS

to the type of search conducted.[4]  Therefore, for purposes of this motion, this court takes as established the fact that the body cavity search conducted by Elenes was visual only.

Next, this court must consider the scope of the search.  Courts have described the degree of intrusion effected by a visual body cavity search in no uncertain terms:  "the feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute."  *Thompson*, 558 F2d at 1439 (citing cases).  It is "dehumanizing and humiliating," *Kennedy*, 901 F2d at 711, and "represent[s] one of the most grievous offenses against personal dignity and common decency."  *Bell*, 441 US at 576-77 (Marshall, J., dissenting).

///

**b.    Place and Manner of Search**

With respect to the second and fourth *Bell* factors, Mr. Houston has presented no admissible evidence that the manner or place of the visual body cavity search was constitutionally defective.  Therefore, the only issue that remains in the *Bell* analysis is the whether the justification for the search outweighs the scope of the intrusion.

**c.    Justification**

Greaves made the decision that Mr. Houston should be strip searched in accordance with the Washington County policy because he came in on transport from another detention facility. In other words, Washington County has a blanket search policy which requires all persons transferred from another detention facility to be strip searched regardless of their alleged crime.

---

[4]  Shortly after the filing of the county defendants' motions, this court notified Mr. Houston that he could not rely on the allegations of his complaint but was required to set out specific facts in declarations, depositions, answers to interrogatories or authenticated documents that contradict the facts set forth in the county defendants' declarations and documents in order to show a genuine issue of fact for trial.  Summary Judgment Advice Notice (docket # 59).

Greaves states that he has found contraband on inmates at intake "at least a dozen times." Greaves Decl., ¶ 2. He further declares that he has "personally found contraband on inmates in the jail living areas numerous times," and that he is "aware, based on information and belief, that other deputies frequently find contraband both at intake and in the living areas of the jail, and that nearly every day a deputy in the jail finds contraband." *Id* at ¶¶ 3-4. He also believes that prior to being transported to the jail, Mr. Houston "could have had contact with other arrestees" while detained at the Beaverton Police Station. *Id* at ¶ 7.

Because this justification is based on the need for institutional security, the objective standard to measure the need for the search requires reasonable suspicion to believe that Mr. Houston had contraband. The county defendants can meet that burden by showing that a particularized suspicion that Mr. Houston was carrying contraband based on the factors outlined in *Thompson.* Those factors include the nature of the offense, Mr. Houston's appearance and conduct, Mr. Houston's prior arrest record, and the fact that Mr. Houston would be moved into the general population of the jail. However, by itself, this final factor is insufficient to justify a blanket strip search policy. *Thompson*, 885 F2d at 1447. Additionally, if the blanket policy of strip searching all persons transferred to the Washington County Jail from another institution or detention facility is reasonably related to their stated concern in institutional security, then it may act as a proxy for reasonable suspicion as applied to Mr. Houston.

The county defendants have offered no evidence that an individualized reasonable suspicion existed to strip search Mr. Houston. Read in their proper light, all of the justifications advanced by Greaves related only to the same intermingling justification asserted as the reason for the policy.

Greaves states that Mr. Houston had been "arrested for violation of a restraining order, and that he could not be force released or released upon his own recognizance." Greaves Decl., ¶

37 - FINDINGS AND RECOMMENDATIONS

19.  Greaves also states that he was "aware that Mr. Houston's only avenue for release was to post a security release" of $5000 and that after talking with Mr. Houston Greaves knew that Mr. Houston, "did not have the funds to post the required security release."  *Id* at ¶¶ 20-21.  The county defendants argue that these statements reflect that Greaves relied on the nature of Mr. Houston's offense.  However, these statements only support the fact that Mr. Houston could not be released and would have to be lodged with the general population of the jail.  There is no evidence to indicate that Greaves considered the nature of the offense in making his determination that Mr. Houston should be strip searched.

A careful reading of Greaves' declaration shows that he had only two possible reasons for ordering the strip search:  (1) Mr. Houston had been transferred from the holding cell at the Beaverton Police Station where he "could have" had contact with other detainees, and (2) Mr. Houston would have to be housed in the general population.  The first of these reasons is pure speculation, and the county defendants have offered no evidence that Mr. Houston was actually housed with other detainees prior to his transfer where he could have obtained contraband.  The second reason is also insufficient as it shows only that Mr. Houston, a pre-trial detainee, would have to be intermingled with the general jail population.  The Ninth Circuit has rejected that reason to justify a strip search.  Accordingly, neither of Greaves' stated reasons provides any level of suspicion that Mr. Houston may have been in possession of contraband.

Even if Greaves had relied upon the nature of the offense, it would still have been insufficient to provide a reasonable suspicion to conduct a body cavity search.  According to the Oregon Supreme Court, "the Legislative Assembly enacted [FAPA] to strengthen legal protection for persons threatened with assault by a present or former spouse or a cohabitant."  *Nearing*, 295 Or at 704, 670 P2d at 138.  "The means chosen for this purpose includ[e] the use of temporary restraining orders, injunctions, and temporary child custody orders . . . and mandatory

provisions for the warrantless arrest upon probable cause of a person believed to have violated

such an order." *Id*, 670 P2d at 138-39.

> In other words, the essence of the Abuse Prevention Act is to prevent acts
> of family violence through restraining orders and, if the court orders are
> disobeyed, to provide legal sanctions for the violations of the orders
> because ordinary criminal actions at law were found to be inadequate to
> achieve this desired legislative result.

*State ex rel. Hathaway v. Hart*, 300 Or 231, 236, 708 P2d 1137, 1139 (1985).

To prevent acts of violence before they occur, a violation of FAPA itself is punishable as

contempt and is not considered to be a crime.  *State v. Litscher*, 207 Or App 565, 569, 142 P3d

549, 551 (2006).  The maximum penalty a violator faces for contempt is a fine of up to $300, up

to six months in jail and probation or community service.  ORS 33.105.  These penalties are

comparable to, but less than, those imposed in Oregon for Class B misdemeanors.  *See*,

ORS 161.615(2) (up to 6 months incarceration) & .635(1)(b) (up to $2,500 fine).  Therefore, this

case is not analogous with those cases finding that the nature of the offense itself provides a

reasonable suspicion to conduct a body cavity search of a pre-trial detainee.  Rather, it is more

closely related to *Fuller*, 950 F2d at 1446, which held that a visual body cavity search of all

felony arrestees could not be justified based on the jail's blanket search policy regardless of the

crime with which they were charged.

While it is conceivable that a violation of a FAPA restraining order may constitute an

offense serious enough to create a reasonable suspicion to search the offender, this case

demonstrates an instance in which it was not.  Mr. Houston's violations of the restraining order

did not involve any acts of violence.  While this court does not down play the seriousness of

disobeying a court order, the nature of the alleged violations here, which included making an

unauthorized phone call and showing up at the child's school for a parent-teacher conference, did

not provide reasonable suspicion to perform a body cavity search of Mr. Houston.  Furthermore,

39 - FINDINGS AND RECOMMENDATIONS

the violations occurred nearly six weeks before the arrest, and the arrest occurred after

Mr. Houston voluntarily arrived at the Beaverton Police Station to pick up his son for his

regularly scheduled visitation time.  At no point do the facts show that Mr. Houston was

uncooperative with police, behaved violently, or gave the police any reason to believe he

possessed weapons or controlled substances.

The county defendants also have failed to provide sufficient evidence to support the use of

concerns for institutional security as a proxy for reasonable suspicion.  The fact that contraband

had been found at intake before and is found frequently in the jail, does not support a policy of

subjecting every single person brought into the jail –  regardless of whether the person is a pretrial

detainee being transferred from a police station or a convicted criminal coming from a state

penitentiary –  to a full visual body cavity search.  To find otherwise would be to allow the county

defendants to make an end run around the Fourth Amendment.  By requiring all pre-trial

detainees who cannot post bail and are transferred from the holding cell at a police station to be

held with the general prison population at the county jail, the county does not escape the

constitutional requirement of an individualized suspicion to conduct this most intrusive of

invasions.

This court recognizes that the interests of the county defendants in the security if the jail

are "extremely weighty."  *Thompson*, 885 F2d 1446.  However, even in view of the importance of

this interest, the fact remains that the Ninth Circuit has specifically held that the mere fact of

intermingling pre-trial detainees with a general population at a jail is insufficient to support a

visual body cavity search.  To subject a pre-trial detainee to a strip search, an officer must still

have an individualized reasonable suspicion that the specific inmate subjected to the body cavity

search possesses contraband.

### 3.    <u>Conclusion</u>

40 - FINDINGS AND RECOMMENDATIONS

Because the visual body cavity search of Mr. Houston was not based on individualized reasonable suspicion that Mr. Houston was in possession of contraband, it was unreasonable and violated his Fourth Amendment right to be free from unreasonable searches.

### C.    Qualified Immunity

Having found a constitutional violation, the court must next determine whether the Greaves and Elenes are nevertheless protected by qualified immunity. *Saucier*, 533 US at 201. The doctrine of qualified immunity protects, "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 US at 818. Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id.* "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 US 224, 229 (1991) (citation and internal quotations omitted). To determine if a public official is entitled to qualified immunity, this court must determine whether it was clearly established at the time of the search that the search was unconstitutional. *Saucier*, 533 US at 201. This inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Id.* Elenes and Greaves can only be held liable for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id* at 202. Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* And, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.*

However, to be clearly established, the law need not be a "precise formulation of the standard" where "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id*. Therefore, the key inquiry in determining whether an officer has qualified immunity is whether the officer has "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 US 730, 739-40 (2002).

The requirement that a police officer must have a reasonable suspicion before performing a body cavity search on a pre-trial detainee has been clearly established since the Supreme Court decided *Bell* in 1979. As discussed above, the Ninth Circuit has further fleshed out this rule by establishing that searches performed pursuant to blanket policies requiring body cavity searches of detainees arrested for minor misdemeanors are unconstitutional unless the search is supported by reasonable suspicion. *Giles*, 746 F2d at 615; *Ward*, 791 F2d at 1333. The court extended this holding to non-violent felony arrestees in *Kennedy*, 901 F2d at 716, and in *Fuller*, 950 F2d at 1437, to instances in which institutional security is advanced as a justification. In *Way*, 445 F3d at 1161, the court held institutional security was an insufficient justification for a blanket policy subjecting all arrestees on drug offenses to visual body cavity searches. Finally, in *Thompson*, 885 F2d at 1447, the court stated the rule that merely placing a pretrial detainee in contact with the general jail population does not justify a strip search, citing *Giles*, 746 F2d at 618, for the proposition that the "fact that [an] arrestee may ultimately be intermingled with general jail population does not, by itself, justify strip search as such intermingling is 'both limited and avoidable.'" The court also quoted from *Masters v. Crouch*, 872 F2d 1248, 1254 (6th Cir 1989), as follows:

> Several cases have recognized imminent mingling with other inmates as a consideration in the decision whether to strip search a detainee. However, the fact of intermingling alone has never been found to justify such a

> search without consideration of the nature of the offense and the question
> of whether there is any reasonable basis for concern that the particular
> detainee will attempt to introduce weapons or other contraband into the
> institution.

As discussed above, all the evidence in this case points to the fact that the sole reason Mr. Houston was subjected to a visual body cavity search was his intermingling with the general population at the jail.  There is no evidence that Greaves or Elenes ever considered the nature of the offense in making their determination to strip search Mr. Houston or that they otherwise had an individualized reasonable suspicion that he possessed contraband.

Had Greaves or Elenes considered the nature of Mr. Houston's offense or considered the search to be sufficiently related to a crime of violence to provide reasonable suspicion that Mr. Houston may be carrying a weapon, the qualified immunity analysis would change.  Although these additional considerations still would not have justified the search, as discussed above, this court has found no other case addressing whether a violation of a FAPA restraining order, or any similar order, could provide reasonable suspicion to perform a body cavity search. Therefore, the officers arguably would not have had fair warning that their conduct violated the constitutional rights of Mr. Houston.

However, the law is clear that reasonable suspicion is required and that the mere fact that Mr. Houston would be housed with the general jail population is insufficient to provide this suspicion.  Based on the evidence submitted by the county defendants to justify the search of Mr. Houston, Greaves and Elenes are not entitled to qualified immunity.

Furthermore, although Greaves ordered the strip search, Elenes cannot escape liability for violating Mr. Houston's constitutional rights merely by claiming he was ordered to do so.  Elenes has an independent duty to be sure that when he conducts a visual body cavity search of a pre-trial detainee there is reasonable suspicion to justify this most intrusive of procedures.  *See*,

*Grossman v. City of Portland*, 33 F3d 1200, 1209 (9th Cir 1994) ("individuals cannot always be held immune for the results of their official conduct simply because they were enforcing policies or orders promulgated by those with superior authority").

**D.      Liability of Washington County**

In order to be held liable for money damages under § 1983, the plaintiff must establish a governmental custom, policy, or practice which directly caused the constitutional violation. *Monell*, 436 US at 691-92.  Washington County admits that the body cavity search of Mr. Houston was conducted pursuant to its policy, namely Washington County Jail Policy J-14-4.  Therefore, Washington County is liable for the constitutional violation to Mr. Houston.

**E.      Conclusion**

Because the county defendants have failed to establish that, based on the undisputed facts, they are entitled to summary judgment as a matter of law on the Fourth Claim, their motions should be denied.

## RECOMMENDATIONS

For the reasons discussed above, the motions of defendants Officer Wolfe, Sergeant Spang, Ms. Houston and Mr. Fowler (dockets # 60, # 66, # 83) should be GRANTED and the First, Second and Third Claims should be dismissed, and the motions of defendants Greaves, Elenes and Washington County (dockets # 54 & # 55) should be DENIED.

## SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due **December 13, 2007.** If no objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

44 - FINDINGS AND RECOMMENDATIONS

and Recommendations will be referred to a district judge and go under advisement.

DATED November 26, 2007.

_____
Janice M. Stewart
United States Magistrate Judge